No. 96-112

IN THE SUPREME COURT OF THE STATE OF MONTANA

1996

FILED

NOV 26 1996

*Ed Smith*

CLERK OF SUPREME COURT
STATE OF MONTANA

IN THE MATTER OF THE ESTATE OF

KATHERYN MAY BROOKS, Deceased.

APPEAL FROM:  District Court of the Twenty-First Judicial District,
              In and for the County of Ravalli,
              The Honorable Jeffrey H. Langton, Judge presiding.

COUNSEL OF RECORD:

        For Appellant:

              Howard C. Greenwood, Attorney at Law,
              Hamilton, Montana

        For Respondent:

              Richard A. Weber, Jr.; Koch, Johnson,
              Weber & Goheen, Hamilton, Montana

                        Submitted on Briefs:  August 22, 1996

                                   Decided:  November 26, 1996

Filed:

                        _____
                                  Clerk

Justice Karla M. Gray delivered the Opinion of the Court.

Bruce C. Brooks appeals from the Findings of Fact, Conclusions of Law and Order of the Twenty-First Judicial District Court, Ravalli County, denying admission of a document dated March 21, 1995, to probate, declaring that Katheryn May Brooks died intestate, and ordering that her estate be distributed accordingly. We affirm.

The restated dispositive issue on appeal is whether the District Court erred in denying admission of the March 21, 1995, document to probate.

Katheryn May Brooks (Kay) died on March 24, 1995, in Ravalli County, Montana, at the age of seventy-nine. She was survived by two children, Bruce C. Brooks (Bruce) and Jean K. Mercer (Jean). At the time of Kay's death, Bruce resided in the family home in Hamilton, Montana. Jean lived in Spokane, Washington.

The relevant circumstances surrounding Kay's final years are generally undisputed. Prior to the death of his father, Virgil Brooks (Virgil), in 1992, Bruce lived in a small house behind the family home owned by Kay and Virgil. Thereafter, he moved into the family home.

Kay lived with Jean in Spokane from the time of Virgil's death in the spring of 1992 until late in December of 1993, when she returned to the family home in Hamilton. Bruce cared for her there until he was called away on business in early June of 1994. At that time, Kay returned to Jean's care in Spokane.

2

The following month, Kay moved to the Discovery Care Center (Discovery), a nursing home in Hamilton, as a result of deteriorating health. Jean drove over from Spokane to visit Kay at Discovery approximately monthly thereafter. Bruce visited daily when he was not away on business. Kay, Bruce and Jean began to discuss the disposition of the family home, resulting in ill feelings between Bruce and Jean which upset Kay.

Kay had executed a "home-drawn" will prior to Virgil's death. On or about March 10, 1995, Bruce assisted Kay in updating that will. He brought it to Discovery and, according to his testimony, reviewed each provision with Kay, making changes as she directed. Bruce tape-recorded a conversation between himself and Kay during which they discussed the revisions to Kay's will. On March 21, 1995, Bruce typed up the new document. Kay signed the document that same day, in the presence of Bruce and his long-time friend Carolynne Merrell (Merrell). Merrell signed the document as a witness. The document listed specific bequests to Bruce, Jean and their children, and left the family home and the remainder of the furnishings and contents--Kay's most substantial asset--to Bruce.

Bruce and Merrell then took the document to Leroy White (White), a notary public and Brooks family friend. White had known Kay for more than fifty years and recognized her signature. At Bruce's request, White signed the document as the second witness and affixed his notarial seal. Kay died three days later.

On May 5, 1995, Bruce filed a petition for formal probate of the March 21, 1995, document as Kay's last will and testament,

3

determination of testacy and heirs, and appointment as personal representative. In response, Jean requested that the document be denied admission to probate, that Kay's estate be distributed via intestate succession, and that she be appointed co-personal representative with Bruce.

The District Court held a hearing on Bruce's petition and, thereafter, entered its findings of fact, conclusions of law and order. Briefly stated, the court denied admission to probate of the March 21, 1995, document and declared that Kay died intestate. Bruce appeals.

Additional facts are provided below as necessary to our resolution of the issue before us.

### STANDARDS OF REVIEW

We will not disturb a district court's findings of fact unless they are clearly erroneous. Rule 52(a), M.R.Civ.P.; Flikkema v. Kimm (1992), 255 Mont. 34, 37, 839 P.2d 1293, 1295. A court's findings are clearly erroneous if they are not supported by substantial credible evidence, the court has misapprehended the effect of the evidence, or our review of the record convinces us that a mistake has been committed. Daines v. Knight (1995), 269 Mont. 320, 325, 888 P.2d 904, 906 (citation omitted). We review a district court's conclusions of law to determine whether the interpretation of the law is correct. Flikkema, 839 P.2d at 1295 (citation omitted).

### DISCUSSION

Did the District Court err in denying admission of the March 21, 1995, document to probate?

4

## A. *Section 72-2-522, MCA*

In contested cases, the proponent of a will must establish that it has been duly executed. Section 72-3-310, MCA. Section 72-2-522(1), MCA, contains the requirements for a duly executed will:

> Except as provided in 72-2-523 . . . a will must be:
>     (a) in writing;
>     (b) signed by the testator or in the testator's name by some other individual in the testator's conscious presence and by the testator's direction; and
>     (c) *signed by at least two individuals, each of whom signed within a reasonable time after having witnessed either the signing of the will as described in subsection (1)(b) or the testator's acknowledgement of that signature or acknowledgement of the will.*

(Emphasis added.) Bruce argued that the March 21, 1995, document had been duly executed under § 72-2-522(1), MCA, and that it should be admitted to probate as Kay's will. The District Court concluded that the document had been signed by only one person who met the criteria set forth in § 72-2-522(1)(c), MCA, and, therefore, that the document was not duly executed.

The March 21, 1995, document is in writing and signed by Kay. Thus, the § 72-2-522(1)(a) and (b), MCA, criteria are met.

The document also contains two signatures on signature lines labeled "witness." The first signature is Merrell's. She signed the document as a witness in Kay's presence immediately after observing Kay sign the document and acknowledge that it was a will. The other "witness" signature is White's. However, White was not present when Kay signed the document. Nor did Kay acknowledge to White either her signature or that the document was her will. Therefore, White's signature is not the signature of a second

5

witness, as required by § 72-2-522(1)(c), MCA, and Bruce did not meet his burden under § 72-3-310, MCA, of establishing that the document had been duly executed.

Bruce cites to Matter of Estate of Weidner (1981), 192 Mont. 421, 628 P.2d 285, as authority for admitting the document to probate as Kay's will "on the testimony of one witness." He does not present any analysis or application of that case to the circumstances presently before us.

Estate of Weidner involved two wills. One was a joint will executed by Leona and E.J. Weidner in 1954, which left all of their property--except for five dollars--to their daughter, Lorraine Brown. The other was an unexecuted copy of a will purportedly executed by Leona in 1965, after E.J.'s death, which "contain[ed] a standard revocation clause." Estate of Weidner, 628 P.2d at 286. Upon Leona's death, Lorraine sought to probate the 1954 will. Gale Weidner, E.J. and Leona's son, petitioned for a formal determination of intestacy and offered an unexecuted copy of the 1965 will. The 1965 will apparently revoked the 1954 will but did not dispose of Leona's property. Estate of Weidner, 628 P.2d at 286.

The dispositive issue on appeal was whether the 1965 will was duly executed. See Estate of Weidner, 628 P.2d at 286-87. We noted that the proponent of a will bears the burden of proving due execution. Estate of Weidner, 628 P.2d at 287 (citing § 72-3-310, MCA). We also noted that, in a contested case, at least one of the attesting witnesses generally must testify. Estate of Weidner, 628

6

P.2d at 287 (citing § 72-3-309, MCA). In Estate of Weidner, the attorney who drafted the 1965 will testified that he witnessed Leona's signing of the will and was "quite certain" that he was an attesting witness. He further testified that, while he was not certain who the other witness was, he believed it was his secretary. The secretary did not testify at trial, but the attorney stated that she did not recall signing the will. On the record before us, we concluded that there was insufficient evidence to support a determination that the 1965 will was duly executed. Estate of Weidner, 628 P.2d at 287.

Estate of Weidner does not support Bruce's position here that the March 21, 1995, document can be admitted to probate where it indisputably was not duly executed as required by § 72-2-522, MCA. The number of attesting witnesses who must testify in a contested will proceeding pursuant to § 72-3-309, MCA, is an entirely different question from whether the purported will met the requirements for a duly executed will under § 72-2-522, MCA. Neither § 72-3-309, MCA, nor Estate of Weidner varies, or could vary, the separate and distinct statutory requirements for a duly executed will which must be established by the proponent of the will.

The record before us in this case demonstrates that the March 21, 1995, document was signed by only one person who witnessed Kay signing the will or acknowledging either her signature or the will. We hold, therefore, that the District Court correctly concluded

7

that the March 21, 1995, document was not duly executed under § 72-2-522, MCA.

## B. *Section 72-2-523, MCA*

As discussed above, the proponent of a will has the burden of establishing due execution. See § 72-3-310, MCA. Where a duly executed will is admitted to probate, a presumption exists that the testator was competent and of sound mind. See In re Bodin's Estate (1965), 144 Mont. 555, 559, 398 P.2d 616, 618-19 (citations omitted). Accordingly, § 72-3-310, MCA, requires the contestant of such a will to establish lack of testamentary intent or capacity or one of the other statutorily-specified circumstances.

Even absent due execution, however, a document still can be admitted to probate as a valid will under certain circumstances. Section 72-2-523, MCA, provides in pertinent part:

> Although a document or writing added upon a document was not executed in compliance with 72-2-522, the document or writing is treated as if it had been executed in compliance with that section *if the proponent of the document or writing establishes by clear and convincing evidence that the decedent intended the document or writing to constitute:*
> (1) *the decedent's will. . . .*

(Emphasis added.) Under the express language of this statute, the proponent of a document bears the burden of proving the decedent's intent that the writing constitutes his or her will.

"Intent" is defined as "the state of mind or mental attitude with which an act is done." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, 1176 (1971). "INTEND implies that the mind is directed to some definite accomplishment or end. . . ." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, 1175 (1971). It is axiomatic that for Kay to have

8

intended the document to be her will, she must have been competent to execute a will at the time she signed the document on March 21, 1995. Indeed, § 72-2-521, MCA, requires that a person be of sound mind to make a will.

"Sound mind," as that term is used in § 72-2-521, MCA, means "that [the] testator must have been able to understand and carry in mind, in a general way, [the] nature and situation of [her] property, [her] relations to those having claim to [her] remembrance, and [the] nature of [her] act." BLACK'S LAW DICTIONARY, 1567 (1968). Similarly, it is well-established in Montana that a testator is mentally competent if she

> is possessed of the mental capacity to understand the nature of the act, to understand and recollect the nature and situation of [her] property and [her] relations to persons having claims on [her] bounty whose interests are affected by [her] will. [Citation omitted.] The "testator must have sufficient strength and clearness of mind and memory to know, in general, without prompting, the nature and extent of the property of which [she] is about to dispose, and [the] nature of the act which [she] is about to perform, and the names and identity of the persons who are to be the objects of [her] bounty, and [her] relation towards them."

Bodin's Estate, 398 P.2d at 619 (citations omitted). See also Matter of Estate of Lien (1995), 270 Mont. 295, 299, 892 P.2d 530, 532; Matter of Estate of Jochems (1992), 252 Mont. 24, 29, 826 P.2d 534, 537.

Thus, unlike the situation in which a duly executed will is admitted to probate, no presumption that the decedent was competent to execute a will exists where § 72-2-523, MCA, applies. In light of Bruce's burden of proof pursuant to § 72-2-523, MCA, therefore, § 72-3-310, MCA--insofar as it imposes a burden upon the contestant

9

of a will to prove lack of testamentary intent or capacity--has no application here.

Bruce attempted to have the March 21, 1995, document admitted to probate pursuant to § 72-2-523, MCA. The District Court listened to testimony and accepted evidence and, thereafter, determined that Bruce had not proved by clear and convincing evidence that Kay was competent when she signed the document on March 21, 1995, and intended the document to be her will.

An underlying finding upon which the court based its ultimate determination that Bruce did not satisfy his burden of proof under § 72-2-523, MCA, was that Kay "did not know what property she had and which would be disposed of by her will." The record contains substantial evidence in support of this finding. Bruce testified that Kay had already given away numerous items of personal property disposed of by the March 21, 1995, document. Indeed, Jean and Kay's grandchildren had received most of the property the March 21, 1995, document purported to bequeath to them. Moreover, the tape-recorded conversation between Bruce and Kay in which they discussed the proposed changes to Kay's will reveals that Kay was unaware that she owned stock until reminded by Bruce.

> BRUCE: You own stock in Ford Motor Company and stock in Australia New Zealand Bank.
>
> KAY: I do? (laughs)
>
> BRUCE: Yes, which has your's, mine, and Jean's names on them as tenants in common. Okay. How do you want to handle those stocks? That's also the Montana Power Stock that Dad bought prior.
>
> KAY: I am no good at that kind of thing. I have no idea.

10

The foregoing evidence indicates that Kay did not have the "clearness of mind and memory to know, in general, without prompting, the nature and extent of [her] property." See Bodin's Estate, 398 P.2d at 619. Without such clearness of mind, and absent the mental capacity to recollect the nature and situation of her property, Kay was not competent to execute a will. See Estate of Lien, 892 P.2d at 532. Thus, this evidence would be sufficient, on a stand-alone basis, to support the District Court's determination that Bruce did not meet his burden of proving, by clear and convincing evidence, that Kay was competent when she signed the will.

The record also is replete with evidence that Kay's mental capacity had deteriorated in the months preceding her death. Kay began seeing Dr. Lisa Milch (Milch) in January of 1994 for abdominal and back pain. Milch noted in office notes dated February 3, 1994, that Kay had trouble relating her medical history and was probably suffering from dementia. Milch's notes also indicate that she spoke with Bruce the following day regarding Kay's memory problems. Bruce told Milch that Kay's memory had been declining and she had become more forgetful in the preceding three to four months.

Milch's office notes of March 16, 1994, state that Kay had complained of progressive forgetfulness and that other people around her had noticed her forgetfulness. Approximately six weeks later, Milch noted that Bruce "feels that [Kay] has had further

11

mental status changes. She seems a little bit more tired and a little bit more forgetful even than a month ago."

In December of 1994, Milch noted that Kay's confusion had increased. Milch again noted Kay's confusion in her office notes dated March 10, 1995. Tests taken on March 22, 1995, showed a high level of acid and an extremely elevated level of carbon dioxide in Kay's blood. According to Milch, the elevated carbon dioxide level indicated that Kay's lungs were unable to dispose of the poisons in her system. Moreover, in Milch's opinion, a high level of acid in the bloodstream has a profound effect on a person's organs, including the brain. Additionally, Milch stated that Kay took a variety of medications that could affect her mental capabilities and memory. Overall, Milch's opinion was that Kay had a history of increasing forgetfulness and suffered from disorientation, especially as to higher thinking levels and cognitive processes.

Dr. Paul Bach (Bach), a clinical psychologist, reviewed Milch's office notes and deposition testimony, Kay's medical records and Discovery's records regarding Kay; he also listened to the tape-recorded conversation of Bruce and Kay discussing Kay's will. Bach testified that the following facts caused him concern about Kay's mental competence: Milch diagnosed Kay with dementia in 1994; Kay had difficulty breathing which affected the amount of oxygen in her lungs and could affect Kay's cognitive ability; Kay was on medications including Prednisone, Flexeril, Darvocet, Percocet and Atarax which could have affected her cognitive

12

functioning; and Milch's notes regularly commented on Kay's poor cognitive status.

Bach further testified that a blood test done on February 19, 1995, revealed that the carbon dioxide level in Kay's blood was very elevated and that approximately one month later, on March 22, that level was even higher. He noted that Kay signed the purported will less than twenty-four hours prior to the second blood test and, based on the test results, Kay's carbon dioxide level was most likely elevated on March 21 as well. He testified that this certainly could have affected her cognitive functioning.

Bach also was concerned about Kay's mental competence based on his review of the tape-recorded conversation between Bruce and Kay.

> Most remarkable was the number of times [Kay] responded to questions put to her by saying something on the order [of] . . . "I'm not good at that kind of thing. . . , decisions to make. . . , I wish. . . , I want someone else to do it. . . , I don't know. . . , I don't remember. . . , I can't remember." Particularly her mention was made of stocks and bonds, and she responded, "I do have some?", as if uncertain that she did. But basically, her verbal responses indicated a woman who was uncertain at the time of the tape recording, and just would continuously give inaccurate responses to a question at different points throughout the tape.

Although Bach did not testify that Kay was not competent when she signed the document on March 21, 1995, he stated that her medical records and the tape-recorded conversation raised serious concerns about whether she was competent at that time. Based on this record, substantial evidence supports the District Court's determination that Bruce did not establish by clear and convincing evidence that Kay was mentally competent--that is, that she had the

13

requisite testamentary capacity and intent--to execute the March 21, 1995, document.

Bruce did offer evidence to rebut the evidence which raised doubts about Kay's mental competence on March 21, 1995. Bruce and Merrell testified that Kay was strong and not easily persuaded to do something which she did not want to do. Discovery employees testified to the same effect. The testimony of Bruce, Merrell and the Discovery employees depicted a strong woman who desired input on her daily life and was cognizant of her surroundings. Our standard of review, however, is not whether the record contains evidence which supports findings different from those made by the District Court. See Caekaert v. State Compensation Mutual Ins. Fund (1994), 268 Mont. 105, 110, 885 P.2d 495, 499 (citation omitted). Moreover, it is within the province of the trier of fact to weigh conflicting evidence and we will not substitute our judgment for that of the factfinder on such matters. Topco, Inc. v. State Dept. of Highways (1996), 275 Mont. 352, 362, 912 P.2d 805, 811 (citation omitted).

Finally, we address briefly Bruce's lengthy argument that the District Court improperly imposed the burden of disproving undue influence on him. He contends that the District Court's imposition of such a burden is contrary to §§ 72-3-310 and 72-2-523, MCA.

Here, Bruce failed to prove either that the March 21, 1995, document was duly executed under § 72-2-522, MCA, or that Kay was competent and intended the document to constitute her will under § 72-2-523, MCA. We conclude, on those bases, that the document

14

properly was denied admission to probate. Under such circumstances, as discussed above, Jean bore no burden of proof under § 72-3-310, MCA, as the contestant of the will. Jean could not have known during the hearing, however, that Bruce would not meet his alternative burdens of proof as the proponent of the document as Kay's will. Consequently, she put on evidence attempting to establish undue influence pursuant to § 72-3-310, MCA, and the District Court determined that Bruce had exerted undue influence over Kay. The District Court then concluded that Bruce bore the burden of disproving undue influence.

Under these facts, it was unnecessary for the District Court to address undue influence at all. Bruce having failed to prove that the document was duly executed or, by clear and convincing evidence, that Kay possessed the requisite mental capacity to execute a will on March 21, 1995, and intended the document to be her will, the District Court need have gone no further.

The District Court erred in interpreting § 72-2-523, MCA, as imposing a duty to disprove undue influence on the proponent of a document purportedly intended as a will. The court's incorrect interpretation of § 72-2-523, MCA, had no effect on the outcome of this case, however. Therefore, we conclude that the error was harmless because it did not affect Bruce's substantial rights. See Rule 14, M.R.App.P.; Abbey v. City of Billings Police Comm'n (1994), 268 Mont. 354, 364, 886 P.2d 922, 928.

We hold that the District Court did not err in denying admission of the March 21, 1995, document to probate.

15

Affirmed.

_____
                     Justice

We concur:

_____

_____

_____
        Justices

November 26, 1996

## CERTIFICATE OF SERVICE

I hereby certify that the following certified order was sent by United States mail, prepaid, to the following named:

Howard C. Greenwood
Attorney at Law
P.O. Box 1567
Hamilton, MT  59840

Richard A. Weber, Jr.
Koch, Johnson, Weber & Goheen
P.O. Box 433
Hamilton, MT  59840

ED SMITH
CLERK OF THE SUPREME COURT
STATE OF MONTANA

BY: _____
Deputy