No. 02-532

IN THE SUPREME COURT OF THE STATE OF MONTANA

2003 MT 132

JOANN HOLTZ,

       Petitioner and Appellant,

  v.

FRANCIS PAUL DEISZ,

       Respondent and Respondent.

APPEAL FROM:    District Court of the Thirteenth Judicial District,
                   In and for the County of Yellowstone, Cause No. DP 2000-281
                   The Honorable Gregory R. Todd, Judge presiding.

COUNSEL OF RECORD:

       For Appellant:

              Brad L. Arndorfer, Arndorfer Law Firm, Billings, Montana

       For Respondent:

              Michael R. Anderson, Anderson & Liechty, Billings, Montana

Submitted on Briefs:  December 5, 2002

Decided:  April 29, 2003

Filed:

_____
Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1 JoAnn Holtz (JoAnn), longtime companion of the decedent, Michael Deisz (Michael), challenges the findings of fact, conclusions of law, and judgment of the District Court regarding the disposition of the decedent's estate. We reverse.

## ISSUES

¶2 JoAnn raises three issues on appeal. We conclude that our resolution of the following issues is determinative:

1. Did the deceased's holographic will make a general, demonstrative, or specific devise to the petitioner?

2. If the devise was specific, was it rendered ineffective--adeemed--when the specific assets were sold and the proceeds placed in the bank?

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 Michael Deisz, a jeweler and city councilman from Billings, Montana, suffered a debilitating stroke while on vacation in California on May 30, 2000. After remaining hospitalized in California for approximately one month, Michael was returned to Billings. There, he lay incapacitated in a nursing home until his death on November 18, 2000 at age 44. He was survived by his companion, JoAnn, his father, a sister, and two brothers.

¶4 A few days prior to his trip to California, Michael left a sealed envelope addressed to "Dad" in his room in the home he shared with JoAnn Holtz, petitioner. This was consistent with his practice of leaving such sealed envelopes with his father before he left town for extended periods. The previous letters were never opened; Michael always

2

retrieved them upon his safe return. It was understood, though, that they contained confidential information, including combinations to his safe, alarm codes, and instructions concerning the disposition of his property.

¶5 After Michael's stroke, the envelope was retrieved and delivered to his father, Francis Deisz (Francis). Inside was a handwritten letter. The letter, dated 5/27/2000, reads as follows:

> Dear Dad,
>
> If something happens you will get $20,000 city life policy please bury me by mom. Please give JoAnn all but $5,000.00 in safe. That will pay rent/bill for 2-3 months so you/her can close down business. If she wants business let her have it! You are welcome to take a ring and watch for yourself. Let Becky pick one ring, also Cathy, and, Amber. If they want earrings/necklace too that's ok! Let JoAnn choose any 2 of _my_ rings, if you want or Dan/Don want one of my rings ok, after JoAnn chooses.
>       Call George & show him this _as_ my _will_ – I want JoAnn to have my house also (1742 Cheryl St.)
>
>                                 Thanks,
>                                 [signed] Michael P. Deisz
>
> P.S. New York Life Policy goes to JoAnn/Rebecca as pre-determined on policy! JoAnn will give you another envelope!
> (Emphasis in the original.)

¶6 Francis submitted an application for informal probate and appointment as personal representative of the estate on December 6, 2000. Based on the existence of the letter above, then assumed to be a holographic will, the application initially referenced the matter as a testate estate. Three weeks later, however, Francis amended the filing as an intestate estate, on the grounds that the holographic will was invalid under Montana law.

¶7 The District Court promptly issued an order of informal appointment of personal representative, declaring the holographic will invalid and naming Francis Deisz personal representative in intestacy of the estate. JoAnn filed a petition for formal probate in April 2001. She sought to have the will declared valid, the estate made testate, and the wishes of Michael followed in distributing his estate.

¶8 After a trial, held on February 1, 2002, the District Court determined that the letter was a valid holographic will, and that it created a specific devise of both Michael's home and business to JoAnn. The court then concluded that those devises were adeemed, based on the sale of the specific assets to pay for Michael's nursing home care. By virtue of this ruling, JoAnn would have been entitled to nothing from Michael's estate beyond the $50,000 in life insurance she had already collected. JoAnn appeals.

¶9 The relationship between JoAnn and Michael was well-documented in the record. They met at a karaoke bar in the summer of 1991. By St. Patrick's Day of 1992, the two slowly began dating. From that point forward, they celebrated St. Patrick's Day as their anniversary. Less than a year after they began dating, Michael moved in to JoAnn's home. Michael lived with JoAnn until the occurrence of his stroke. His house was left unoccupied in the intervening years.

¶10 According to JoAnn and friends of the couple, after many years together, JoAnn and Michael talked about marriage. JoAnn had five children with a range of problems. She and Michael apparently felt strongly that they should not marry until the youngest child reached 18, so that Michael would not become responsible for the children if anything happened to

4

JoAnn.  It is clear from the record that neither JoAnn nor Michael had a particularly good relationship with her children.  Prior to surgery in 1999, JoAnn scribbled the following note to her children on the back of a hospital form:

> Kids, <u>Do not</u> give Michael a hard time if I do die.  He's here with me you weren't!  Its [sic] all in his name for practical reasons.  You'll get stuff from him your personal toys clothes & whatever you want & he chooses to give you.  Be grateful for what you get & shut up!  You didn't buy it for me give it to me or earn it!  Love Mom JoAnn Holtz

¶11    The Deisz family asserts that despite their living situation, shared vacations, etc., JoAnn and Michael were only friends.  They insist Michael never had any plans to marry JoAnn; however, close friends of the couple testified to the contrary.  Submitted into evidence were photographs of JoAnn and Michael together, looking very much like a couple, and romantic cards Michael gave JoAnn.  The text of one such card says: "Everything that makes love special . . . we share in the most wonderful way.  Happy Anniversary With All My Love."  The card is hand signed "Michael."  The text of a second card reads:

> The Meaning of Love
> SOMEONE who makes you feel good about living, who brings out the you who is joyful and giving – This is the Meaning of Love.
> SOMETHING that gives you a chance to be strong, or trust in another to help you along – This is the Meaning of Love.
> SOMEWHERE that you feel like you've been forever – a place where you're growing and learning together – This is the Meaning of Love.
> With you, I've found someone who accepts me as I am, yet helps me to become a better, more fulfilled person . . .
> With you, I've found something that allows me to be strong, yet gives me comfort and support whenever I need it . . .
> With you, I've found the somewhere that makes me feel sheltered and secure, yet free to grow and develop on my own . . .
> With you, I've found what it seems I had been looking for forever – the beautiful, and very real, meaning of love!

Happy Birthday, Sweetheart

At the conclusion of the text, are the handwritten words "Please present for 1 dinner your choice, & $100 @ my store Love Michael."

¶12    Friends of the couple also testified that Michael had, on several occasions, expressed concern about JoAnn's future if anything happened to him. According to those witnesses, Michael asserted that she "would be well taken care of." They said he intended to ensure that she was supported financially and not left in need.

¶13    After Michael's stroke, there was concern that his insurance--connected to his position as a city council member--would terminate because he was no longer functioning as a city councilman. Accordingly, the family decided--with JoAnn's consent--to sell his business and his home. The intention was that the proceeds would pay for the full-time care Michael would continue to require after the insurance ran out. There was also testimony that Michael agreed, through communicative blinking, to the sale of these assets to provide for his care.

¶14    As it happened, Michael's insurance covered all his care prior to his death. The money from the sale of the business and house was never used for this purpose. Rather, it has been sitting in a bank account since the assets were liquidated. In addition to those proceeds, Michael's father also sold items not specifically mentioned in the will, including Michael's car and some furniture. After the payment of various medical and funeral expenses, there is now between $69,000 and $70,000 in the estate's checking and savings accounts, awaiting the outcome of this appeal.

**STANDARD OF REVIEW**

¶15 The standard of review of a district court's findings of fact is whether they are clearly erroneous. *In re Estate of Charles Kuralt*, 2000 MT 359, ¶ 14, 303 Mont. 335, ¶ 14, 15 P.3d 931, ¶ 14 (citing *Daines v. Knight* (1995), 269 Mont. 320, 324, 888 P.2d 904, 906). A district court's findings are clearly erroneous if they are not supported by substantial credible evidence, if the trial court misapprehended the effect of the evidence, or if a review of the record leaves this Court with the definite and firm conviction that a mistake has been committed. *Kuralt*, ¶ 14 (citing *Norwood v. Service Distrib., Inc.*, 2000 MT 4, ¶ 21, 297 Mont. 473, ¶ 21, 994 P.2d 25, ¶ 21). It is within the province of the trier of fact to weigh conflicting evidence, and a reviewing court will not substitute its own judgment for that of the factfinder on such matters. *In re Estate of* Brooks (1996), 279 Mont. 516, 526, 927 P.2d 1024, 1030. We review a district court's conclusions of law *de novo*, to determine whether the court's interpretation of law is correct. *Kuralt*, ¶ 14 (citing *Carbon County v. Union Reserve Coal Co.* (1995) 271 Mont. 459, 469, 898 P.2d 680, 686).

**DISCUSSION**

¶16 We are mindful that finding clear error in the factual determinations of a district court requires overcoming presumptions favoring the district court's judgment on factual questions. That said, we are constrained to conclude that the District Court made clearly erroneous findings in this case. In some instances, it entered factual findings despite a lack of substantial credible evidence to support them (when, instead, the substantial credible evidence supported a contrary finding); in others, the court misapprehended the effect of

7

evidence, construing as relevant facts that should have had no bearing on the outcome of the case. We are therefore left with the firm conviction that a mistake has been made in the outcome of this case.

¶17    Finding 19, for example, is not supported by substantial credible evidence. The court wrote: "Michael treated Petitioner Holtz kindly and generously, but without any indication that their relationship was other than 'friends.'" As noted above, the record provides ample evidence of a romantic relationship. Given that the District Court did not dispute the validity of the greeting cards admitted into evidence and cited above, we are at a loss to explain how the court could interpret those cards as evidence of anything but a romantic relationship.

¶18    In finding 23, the court asserts "no values were stated for proceeds from the house sale or proceeds from the sale of the business assets." This finding is clearly in error. Francis Deisz testified that all the money from the sale of Michael's assets was in the bank, save a small portion he used to pay expenses. Michael's only significant assets *were* his house and his business. His father estimated the current total in the savings and checking accounts at between $71,000 and $73,000. In addition to the proceeds from the liquidation of the jewelry business and Michael's home, Francis deposited the following into the bank account: $2,800 from the sale of the car, between $200 and $600 from the sale of the washer and dryer and some furniture, a $4600 tax refund, and approximately five monthly payments of $450. Given this testimony, simple subtraction is all that is required to approximate the proceeds from the sale of the house and the business. Our calculations put that estimate at between $60,750 and $63,150. However, our estimate based on the trial testimony is likely

not even necessary: Francis kept meticulous track of the money. A checkbook he maintained, which tracks all expenditures and deposits after Michael became incapacitated, was admitted into evidence. Further, in response to a question about the sale of the house in JoAnn's interrogatory, Francis referred JoAnn to the "closing documents from the sale of said residence." It appears the court ignored these significant portions of the record when it erroneously concluded that there were no values established for proceeds from the sale of the house or the business.

¶19 Moreover, it appears the District Court was swayed by facts irrelevant to the disposition of this estate. For example, finding eight asserts that Michael had never suggested JoAnn become a co-owner of his home, his business, or his personal property. The two never signed joint deeds, filed joint tax returns, made joint payments on indebtedness, or in any other way demonstrated an intent to co-mingle personal or real property. Finding nine indicates that Michael intended to retain sole ownership of his house, business, and personal property upon his return from California. In finding 15, the court states "Michael had ample opportunity to add Ms. Holtz' name to the deed on his residence or make her a business partner, but he had never done so, and given extrinsic evidence of his intentions regarding those properties, never intended to do so." In findings 19 and 20, the court asserts that Michael never considered JoAnn his spouse or common law wife.

¶20 None of the above findings is remotely consequential to this case. Even assuming the District Court was correct about each element of these findings, they do not alter--in any way--the clear intent of Michael's holographic will. The fact that Michael did not intend to

9

name JoAnn co-owner of his business or home, and planned to retain sole ownership of his assets if he remained healthy, provides no insight whatsoever into what he might want done in the event of his death. For that insight, we obviously look to the document Michael himself called "my will."

¶21 The District Court, in finding 16, apparently found it persuasive that after Michael was returned to Billings, "*with the knowledge and consent of Petitioner Holtz*, all parties agreed that Michael's care required liquidation of his residence and business" (emphasis in original). Again, Ms. Holtz' consent to the sale of his assets, including those granted to her in his will, does not in the least undermine her case. One would hope for such a decision from a woman who had been, for years, the caring companion of a now gravely ill man. JoAnn's unqualified assent to the sale of assets that would otherwise go to her strengthens, rather than subverts, her claim that she and Michael enjoyed a genuine and loving relationship.

¶22 In finding 17, the court states:

> After his stroke, Michael Deisz manifested his consent to liquidate certain property, including his residence and business, to provide for his reasonable and necessary medical treatment and care. Such facts and circumstances evidence Michael Deisz' intention to render distributions of property set forth in the letter of May 27, 2000, ineffective in the event of his death, because he did not own them.

This finding is both unsupported and illogical. First, Michael's father testified that Michael seemed to object to the sale of his assets. We note the following exchange between Francis and his attorney on direct examination:

10

Q. Did you develop a means of communicating with Michael following his stroke?
A. Not down in California. He was just there. I mean he didn't blink his eyes. There was no reaction from Mike in California. When he got here to the hospital, before he went to the nursing home at St. Vincent's, he opened his eyes big for no and closed them for yes.
Q. Did you attempt to discuss with him or in his presence your plan to liquidate either his house or his business?
A. Yes. I told him I have to do it.
Q. Were you able to read any emotion or objection on his part?
A. At that time, he was not happy about it.
Q. At any other time, did he object or express –
A. Later on when I sold his house and I put the money in the bank and I said, "Hey, you know how much money you've got in the bank?" And he smiled. So I guess he approved at that time.

Michael was gravely ill, unable to walk or even speak. Assuming his gestures were accurately interpreted, the testimony above suggests that Michael actually objected to the sale of his home and business prior to those transactions. He was not given a choice in the matter. His father told him "I have to do it." Further, even if we accept as fact that Michael ultimately did consent to the liquidation of his business and home through nods and blinks (after the fact, apparently), the court makes a giant--and legally unsupported--leap when it concludes that this consent evidences his intention to render the distributions of property set forth in his will ineffective.

¶23 As we discuss the issues below, we do so in the context of the bedrock principle of honoring the intent of the testator. *Kuralt*, ¶ 17 (citing, *e.g. In Re Estate of Irvine* (1943), 114 Mont. 577, 139 P.2d 489; *In Re Estate of Van Voast* (1953), 127 Mont. 450, 266 P.2d 377; *In Re Estate of Ramirez* (1994), 264 Mont. 33, 869 P.2d 263).

## ISSUE ONE

¶24 **Did the deceased's holographic will make a general, demonstrative, or specific devise to the petitioner?**

¶25 In the past, we have been called upon to determine whether a will makes a specific or general devise. We said:

> As a rule, a general devise is one which, in accordance with the terms of the will, may be satisfied out of the testator's estate generally and is not charged upon any specific property. A general devise does not attempt to dispose of any specific article of property, but may be satisfied out of the general assets of the testator's estate. . . A specific devise differs from a general devise in that it is not intended by the testator to be paid out of the estate generally, but is to be paid solely by delivering to the devisee that specific article given by the will. In case of doubt as to the testator's intention, courts have generally presumed that the testator intended to give a general devise rather than a specific one. To find a specific legacy, there must generally exist some indication of intent.

*Matter of Estate of Wales* (1986), 223 Mont. 515, 517, 727 P.2d 536, 537. In a footnote, we explained: "The aversion of the courts toward construing devises as specific is usually attributed to the fact that such gifts are subject to ademption in the event their subject matter is disposed of by the testator after execution of the will, a result which is regarded as imposing a hardship on the devisee." *Wales*, 223 Mont. at 517, 727 P.2d at 537. That is precisely the concern in this case.

¶26 A close reading of the will reveals the following: JoAnn was to receive all but $5,000 in the safe (which was to be used for expenses). She was designated to receive Michael's business if she wanted it, $50,000 in life insurance, and Michael's house. Further, Michael's father and brothers were authorized to choose one of his

12

personal rings each only *after* JoAnn had chosen the two she would like. Michael's father was designated the beneficiary of a $20,000 life insurance policy. Michael's sister, Rebecca, was to receive $25,000 in life insurance and a single ring. Finally, Michael's two nieces were each granted one ring.

¶27 The significance of the disposition Michael outlined for his estate is that he chose JoAnn to be the beneficiary of his major assets. His father and his sister each received much more modest sums in life insurance, and remaining family members received only one ring apiece. Based on this distribution of assets, in addition to evidence in the record indicating that Michael intended to make sure JoAnn was well taken care of in the event of his death, and the presumption in favor of finding a general devise, we conclude that the devise to JoAnn in the holographic will was a general one.

¶28 The estate argues--and the court found--that Michael's holographic will failed to designate the entire estate, or the residue of the estate, to JoAnn. The court stated "Petitioner presented *no* evidence to support a claim that she was to receive the 'remainder' of Respondent's estate, and such a claim is contrary to any expression of intent contained in the May 27, 2000, letter." (Emphasis added.) This finding is not supported by substantial credible evidence. Clearly, this holographic will does not adhere to all the formal conventions of a will. However, in choosing to recognize holographic wills as valid, Montana has made clear its preference to seek guidance from the intent of the testator, rather than relying on complex procedural rules when

13

such reliance would frustrate the testator's wishes. Section 72-2-522(2), MCA(2002), Official Comments. That preference also applies to determining whether a devise is specific or general. *Wales*, 223 Mont. at 517, n.2, 727 P.2d at 537, n.2.

¶29 In this case, there is ample evidence that Michael intended the bulk of his estate to go to JoAnn, with much smaller bequests to other family members. The only assets remaining in Michael's estate (the "residue") were a car worth $2,800, used furniture, and a used washer and dryer set. It would be counterintuitive to conclude that Michael's failure to specifically dispose of these inexpensive items of property is evidence that he did not intend for JoAnn to have everything in his estate that was not specifically devised to another relative. If the State does not require a citizen to meticulously adhere to the formal requirements of a will, we cannot seriously expect him--in a handwritten document--to catalogue and bequeath every item he owns, from his old washer and dryer to his toaster. Michael carefully disposed of the property he owned that was of significant value, and all that property went to JoAnn. We find this, as well as the will's language, to be persuasive evidence that the testator intended to create a general devise to JoAnn.

¶30 By definition, a general devise cannot be adeemed. We therefore reverse the District Court's determination that Michael intended to adeem the devises to JoAnn after his stroke. Rather, we conclude that JoAnn is entitled to the proceeds remaining in the estate after all debts are settled.

¶31    Our conclusion under Issue One is dispositive; however, even under an alternative interpretation of the devise, we reach the same result.  If, as the District Court concluded, the will were construed to provide only a specific devise to JoAnn-- as opposed to a general devise--application of § 72-2-616, MCA(2002), would lead to the same conclusion.

## ISSUE TWO

¶32    **If the devise was specific, was it rendered ineffective--adeemed--when the specific assets were sold and the proceeds placed in the bank?**

¶33    Had we found a specific devise, rather than a general one, our next step would be to consult § 72-2-616, MCA (2002), titled "Non-Ademption of Specific Devises." Subsection (1)(f) reads:

> A specific devisee has the right to the specifically devised property in the testator's estate at death and (f) unless the facts and circumstances indicate that ademption of the devise was intended by the testator or ademption of the devise is consistent with the testator's manifested plan of distribution, the value of the specifically devised property to the extent the specifically devised property is not in the testator's estate at death and its value or its replacement is not covered by subsections (1)(a) through (1)(e).

¶34    The District Court, in its conclusions of law, stated  "The facts and circumstances of decedent's letter of May 27, 2000, and the universal agreement to sell Michael's house and business assets indicate that ademption was consistent with Michael's plan of distribution." The court goes on to add:

> It also very specifically indicates ademption was not only intended by Michael, but agreed to by Holtz . . . Both decedent and Petitioner knowingly

15

consented to use the proceeds of decedent's estate for his care with knowledge of the existence and contents of the letter of May 27, 2000.

¶35 According to the Official Comments to § 72-2-616, MCA, if specifically devised property is not in the testator's estate at death:

> subsection (a)(6) 72-2-616(1)(f) creates a mild presumption against ademption by extinction, imposing on the party claiming that an ademption has occurred the burden of establishing that the facts and circumstances indicate that ademption of the devise was intended by the testator or that ademption of the devise is consistent with the testator's manifested plan of distribution.

The estate--the party asserting that ademption has occurred here--wholly failed to meet its burden of establishing any facts and circumstances that would indicate Michael intended to adeem the devise to JoAnn, or that such an ademption would be consistent with his plan of distribution. There was simply no evidence on this point at all, nor does the District Court cite any.

¶36 The court's repeated assertions that JoAnn somehow consented to the ademption by not fighting the family's decision to sell the assets to ensure that money was available for Michael's care, are factually and legally unsupportable. First, as we said earlier, JoAnn's assent to the sale of the assets was both necessary and commendable. The court's conclusion that JoAnn's willingness to see Michael's estate partially depleted for his best interests signaled her intention to relinquish her share of the estate is simply not demonstrated in the record.

¶37 Moreover, as JoAnn notes, her actions and intent are completely irrelevant to the disposition of this case. It is the testator's intent that is relevant, and there was simply no

16

evidence to suggest that Michael intended to revoke the devise to JoAnn. Even if we assume Michael consented to the sale of his property, we have no reason to believe he did so with the intent of revoking his bequests to JoAnn. More importantly, there was no evidence to support the finding of such an intention.

¶38 The presumption against ademption was not overcome here. There was no competent evidence to the effect that Michael intended to adeem, nor did any evidence demonstrate an unwritten or unspoken manifest plan of distribution that would compel ademption. This being so, the provisions of § 72-2-616(f)(1), MCA, control. If we assume Michael's devise to JoAnn to be specific, JoAnn has the statutory right to the value of what the court construed to be the specifically devised property: Michael's home and his business. Thus, whether we consider the devise general or specific, the result is the same.

## CONCLUSION

¶39 Accordingly, we reverse the District Court's findings of facts and conclusions of law and remand for proceedings consistent with this Opinion. Upon remand, and pursuant to JoAnn's request, a neutral representative should be appointed to dispose of the remainder of the estate.

/S/ PATRICIA COTTER

We Concur:

/S/ JAMES C. NELSON
/S/ TERRY N. TRIEWEILER
/S/ JIM REGNIER

17

/S/ JIM RICE