No. 05-234

IN THE SUPREME COURT OF THE STATE OF MONTANA

2007 MT 21

JOHN W. RAY,

       Plaintiff and Appellant,

   v.

MONTANA TECH OF THE UNIVERSITY OF
MONTANA, W. FRANKLIN GILMORE, DANIEL
BRADLEY, DOUGLAS ABBOTT, JOHN HINTZ,
and MARGARET PETERSON,

       Defendants and Respondents.

APPEAL FROM:    District Court of the First Judicial District,
                In and for the County of Lewis and Clark, Cause No. CDV 01-376,
                The Honorable Thomas C. Honzel, Presiding Judge.

COUNSEL OF RECORD:

       For Appellant:

           James P. Reynolds, Reynolds, Motl & Sherwood, Helena, Montana

       For Respondents:

           Amy D. Christensen and Elizabeth S. Baker, Hughes, Kellner, Sullivan &
           Alke, Helena, Montana

           David Aronofsky, Legal Counsel, University of Montana, Missoula,
           Montana

                       Submitted on Briefs:  January 24, 2006
                                Decided:  January 30, 2007

Filed:

                              Clerk

Justice John Warner delivered the Opinion of the Court.

¶1 John W. Ray (Ray) appeals two District Court Orders entered in the First Judicial District, Lewis & Clark County. The first affirmed the Montana Human Rights Commission's dismissal of his discrimination claims. The second order granted summary judgment to Montana Tech and the individual defendants, dismissing Ray's claims brought under 42 U.S.C. § 1983, wherein he alleged that his civil rights were violated when his contract as a department head at Montana Tech was not renewed. We affirm.

¶2 Ray has stated the issues he brings on appeal as follows:

¶3 1. Did Montana Tech discriminate against Ray because of his political beliefs and in violation of his constitutional right to freedom of speech?

¶4 2. Did Montana Tech discriminate against Ray on the basis of his marital status?

¶5 3. Did Montana Tech violate Ray's right to due process?

BACKGROUND

¶6 Ray joined the Montana Tech faculty in 1975 and began serving as a full professor of humanities and social sciences in 1990, a position he continued to hold at the time he commenced this litigation. Ray was named program manager of liberal studies in August 1997. In August 1998, Ray was named head of a newly created Liberal Studies Department, a move which increased his salary by $2,500 per year. As department head, Ray's immediate supervisors were Douglas Abbott (Abbott), dean of the College of Humanities, Social Sciences and Information Technology, and Daniel J. Bradley (Bradley), academic vice chancellor.

¶7 Ray and Bradley had a history of conflict. In June 1998, while petroleum engineering dean, Bradley discussed with liberal studies faculty member Henry Gonshak (Gonshak) the possibility of Gonshak teaching a new course for engineering students. Ray, as program manager, angrily objected to Bradley's failure to initiate the discussion with him, and also made these complaints to the faculty senate after becoming department head.

¶8 In early 1999, Ray voted against Gonshak's promotion to full professor, even though a consensus of the department supported the promotion. Later, Ray wrote a letter expressing tepid support for Gonshak. The record indicates Bradley, Abbott, and Gilmore, Montana Tech chancellor, believed that Ray's actions suggested retaliation for Gonshak's previous cooperation with Bradley.

¶9 In February 1999, Ray challenged Montana Tech's authority to require faculty members to teach evening classes. On another occasion, Ray questioned the legal basis of a request by Bradley and Abbott to investigate complaints alleging that a faculty member came to classes drunk. Gilmore, Bradley and Abbott considered Ray's handling of these matters to be inappropriate.

¶10 Also, in what Bradley and Abbott considered indicative of Ray's adversarial approach to the Montana Tech administration, Ray asked for and received permission to tape two meetings with administrators, saying that taping would provide a more accurate record of the meetings.

¶11 In March 1999, Roberta Ray (Roberta), Ray's wife and a member of Montana Tech's liberal studies faculty, suffered an ankle injury. During a telephone conversation

3

between Roberta and Abbott concerning relocating Roberta's office to a building with disability access, Roberta hung up on Abbott. When Abbott called her back, Ray answered and took up the argument on behalf of Roberta. Abbott interrupted Ray, saying he needed to talk to Ray as department head, not as Roberta's husband.

¶12 Ray was involved in environmental advocacy through various organizations, ballot initiatives, and public speaking engagements. In April 1999, Ray gave a talk at a mine waste technology conference criticizing the mining industry and the environmental insensitivity of engineering students. Following the talk, multiple audience members complained to Gilmore, urging him to fire or discipline Ray. Gilmore agreed with some of the comments and referred to Ray as an "environmental bigot." Gilmore also received a complaint from one audience member concerning a talk by another speaker associated with Montana Tech, but did not investigate this complaint. Although he did take some actions to investigate Ray's comments at the conference, Gilmore took no adverse action against him.

¶13 Also, while Ray served as department head, a long-standing conflict between him and Joanne Cortese, head of the Professional Technical Communications Department, continued. In October 1998, Bradley and Abbott met with both Ray and Cortese to discuss a possible resolution of this conflict. Bradley ordered that Ray and Cortese take initial steps to resolve their differences. Ray did not do so. Rather, he complained to the faculty senate. Gilmore, Bradley and Abbott considered Ray's complaint inaccurate and felt that he should not have raised the issue with the faculty senate.

¶14 Another meeting regarding the on-going interdepartmental conflict took place in

June 1999, with Bradley, Abbott, Ray and Cortese attending. Bradley and Abbott proposed a possible solution involving physical relocation and faculty realignments. Ray agreed to take the proposals to his department for discussion, causing Gilmore to comment that Ray "had grown" in his position as department head. Ray discussed the proposals in the Liberal Studies Department, making clear his opposition. He also sent an e-mail to his supervisors on June 30, 1999, in which he likened the proposals to harassment and threatened to mobilize students and others to oppose the relocation proposal at every step. Gilmore, Bradley and Abbott considered the content of this e-mail to be inappropriate for a department head.

¶15 Bradley and Abbott met to discuss whether to recommend renewal of Ray's position as department head. Abbott prepared a draft evaluation in the event they decided to recommend Ray's renewal. However, in this draft he noted that Ray had difficulty in distinguishing between his role as department head and his role as husband to another department member. Bradley and Abbott did not discuss the contents of Abbott's draft evaluation recommending renewal of Ray as department head. Rather, they decided they would not recommend that Ray's contract as a department head be renewed. At this meeting they did not discuss or consider Ray's marital status or his environmental activism. Abbott did not give a copy of the draft evaluation, or any other formal evaluation, to Ray.

¶16 At a July 1999 meeting, Gilmore, Bradley, and Abbott, along with John Hintz, vice chancellor for administration, and Maggie Peterson, human resources director, discussed concerns regarding Ray's performance as department head. Specifically, they

5

discussed Ray's handling of the on-going conflict between departments, the night class scheduling issue, his reluctance to investigate an allegedly drunk faculty member, his taping of meetings, his reaction to Bradley's discussion with Gonshak, his subsequent treatment of Gonshak, and his e-mail of June 30, 1999.

¶17 Abbott later gave conflicting testimony about whether Ray's marital status was discussed at the July 1999 meeting. However, all of the other individuals at the meeting stated that Ray's marital status was not discussed. Nor was Ray's environmental activism discussed at this meeting. The group decided not to renew Ray as department head. Abbott wrote a letter the same day informing Ray of this decision.

¶18 Department heads at Montana Tech signed one-year contracts. Although such contracts were typically renewed for successive one-year terms of five to seven years, the decision was made not to renew Ray after he had served in the position for less than a year. He was the only department head not renewed at that time.

¶19 While department heads were often renewed for several successive years, the *Policy and Procedures Manual of the Mont. Bd. of Regents of Higher Educ.*, which applies at Montana Tech, provided that academic administrators serve at the discretion of the chancellor. Also, Ray's appointment as a department head was governed by an express policy prohibiting a guarantee of multi-year renewal of such positions.

¶20 Neither Ray's interim nor permanent replacements were environmental activists or married to other department members.

¶21 Ray filed two complaints with the Department of Labor and Industry, Human Rights Commission. One complaint alleged discrimination against him because of his

political beliefs and the other alleged discrimination based on marital status. These complaints were consolidated for hearing. The hearing examiner filed a Final Agency Decision in January 2002 wherein he determined that both of Ray's claims should be dismissed. The hearing examiner found that although Ray established a prima facie case of both political belief and marital status discrimination, Montana Tech had established legitimate business reasons for Ray's non-renewal. The hearing examiner then determined that Ray failed to prove that the reasons given by Montana Tech for his non-renewal as department head were pretextual. The Human Rights Commission affirmed the Final Agency Decision in May 2002.

¶22 Ray then filed a complaint in District Court seeking review of the Commission's decision. He later amended his complaint, adding counts which alleged violation of his right to freedom of speech and the denial of his right to due process.[1] The District Court granted Montana Tech's unopposed motion to bifurcate the action between the claims heard before the Human Rights Commission and those brought for the first time in Ray's amended complaint.

¶23 In a Memorandum and Order, filed in February 2004, the District Court affirmed the Commission's order affirming the Final Agency Decision. Subsequently, by Memorandum and Order filed November 2004, the District Court granted Montana Tech's motion for summary judgment dismissing the civil rights claims in Ray's amended complaint which alleged violation of his rights to due process and freedom of

---

[1] Ray's amended complaint included other claims for relief, but because they are not at issue in this appeal, we do not discuss them.

speech. Ray timely appealed both Orders.

STANDARD OF REVIEW

¶24 When reviewing an agency decision, a district court may not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. Section 2-4-704(2), MCA. In a contested case, a district court reviews an administrative decision to determine whether the findings of fact are clearly erroneous and whether the agency correctly determined the law. *Ostergren v. Dept. of Revenue*, 2004 MT 30, ¶ 11, 319 Mont. 405, ¶ 11, 85 P.3d 738, ¶ 11. We have adopted the following three-part test to determine if a finding is clearly erroneous:

> (1) the record will be reviewed to see if the findings are supported by substantial evidence; (2) if the findings are supported by substantial evidence, it will be determined whether the [deciding body] misapprehended the effect of evidence; and (3) if substantial evidence exists and the effect of evidence has not been misapprehended, the Supreme Court may still decide that a finding is clearly erroneous when, although there is evidence to support it, a review of the record leaves the court with the definite and firm conviction that a mistake has been committed.

*Weitz v. Dept. of Nat. Resources & Conserv.*, 284 Mont. 130, 133-34, 943 P.2d 990, 992 (1997). This Court employs the same standards when reviewing a district court's order affirming an administrative decision. *Ostergren*, ¶ 11.

¶25 We review a district court's summary judgment ruling *de novo*, by applying the criteria in M. R. Civ. P. 56. *Town of Clyde Park v. Younkin*, 2004 MT 274, ¶ 9, 323 Mont. 197, ¶ 9, 99 P.3d 196, ¶ 9. The moving party must demonstrate both the absence of genuine issues of material fact and that they are entitled to judgment as a matter of

8

law. *Clyde Park*, ¶ 9. If there is no genuine issue of material fact, we then review the district court's conclusions of law for correct interpretation of the law. *Clyde Park*, ¶ 9.

DISCUSSION

ISSUE ONE

¶26 **Did Montana Tech discriminate against Ray because of his political beliefs and in violation of his constitutional right to freedom of speech?**

¶27 In his statement of this first issue, and in his briefing, Ray has taken a shotgun approach. In a twisted and confusing manner, he has combined his appeal of the District Court's order affirming the Commission with his appeal of the District Court's grant of summary judgment dismissing his 42 U.S.C. § 1983 civil rights claim. For the sake of clarity, we discuss these claims separately.

*A. Complaint of political discrimination before the Montana Human Rights Commission.*

¶28 According to Ray, he held environmental beliefs which were known to Montana Tech and, when he espoused those beliefs publicly, the school unlawfully discriminated against him by refusing to renew his contract as department head. He claims the non-renewal of his contract violated § 49-2-308(1)(c), MCA, which makes it unlawful for Montana Tech to discriminate against a person in his employment because of his political beliefs, and also violated § 49-3-201(1), MCA, which requires Montana Tech to appoint, assign and promote personnel on the basis of merit without regard to political ideas.

¶29 In analyzing Ray's political discrimination claim before the Commission, both the hearing examiner and the District Court applied the burden-shifting test from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817 (1973), which this Court adopted

9

in *Martinez v. Yellowstone Co. Welfare Dept.*, 192 Mont. 42, 626 P.2d 242 (1981). Claims of employment discrimination analyzed under the *McDonnell Douglas* test are claims involving circumstantial evidence of unlawful discrimination or pretext. *Laudert v. Richland Co. Sheriff's Dept.*, 2000 MT 218, ¶ 20, 301 Mont. 114, ¶ 20, 7 P.3d 386, ¶ 20.

¶30    Ray, without distinguishing which claim he is referring to, argues that the *McDonnell Douglas* test is inappropriate.  However, as noted by the Commission's hearing examiner, Ray presented no direct evidence of discrimination based on his political beliefs.  He claimed that since he spoke out about his political beliefs and Montana Tech didn't renew his contract as head of the department, the school must have discriminated against him because of his political beliefs.  Circumstantial evidence is "that which tends to establish a fact by proving another and which, though true, does not of itself conclusively establish that fact but affords an inference or presumption of its existence."  Section 26-1-102(1), MCA.  Ray's claim before the Commission that he was discriminated against because of his political beliefs is based on circumstantial, or indirect, evidence.  Thus, the *McDonnell Douglas* test was correctly applied to this claim.

¶31    Under the *McDonnell Douglas* test the plaintiff first has the burden of proving, by the preponderance of the evidence, a prima facie case of discrimination.  If the plaintiff succeeds, the burden then shifts to the defendant to provide some legitimate, nondiscriminatory reason for the adverse action against the employee.  Finally, if the defendant meets this burden, the plaintiff must have an opportunity to prove, by a preponderance of the evidence, that the reasons for adverse action offered by the

10

defendant were not true, but, rather, were a pretext for discrimination. *Taliaferro v. State*, 235 Mont. 23, 27-28, 764 P.2d 860, 863 (1988) (citing *Tex. Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252-53, 101 S. Ct. 1089, 1093 (1981)). The *McDonnell Douglas* test is a flexible one and the requirements will not be applied rigidly in every instance. *See Martinez*, 192 Mont. at 48, 626 P.2d at 246.

¶32     In the present instance, to establish his prima facie case, Ray had the burden of showing: (1) that he espoused political beliefs concerning environmental matters which were known to the university; (2) that he was qualified for his position as head of the Liberal Studies Department; (3) that, despite his qualifications, he was replaced; and (4) that he was replaced by someone who did not share his political beliefs.

¶33     The hearing examiner concluded that Ray established a prima facie case of discrimination based upon his political beliefs and speech. Thus, the burden shifted to Montana Tech to establish legitimate, nondiscriminatory reasons for Ray's non-renewal as a department head. At this second stage of the *McDonnell Douglas* test, the defendant's burden is one of production – not persuasion. *Johnson v. Bozeman Sch. Dist. No. 7*, 226 Mont. 134, 140, 734 P.2d 209, 212 (1987). That is, defendant does not have to persuade the court that it was motivated by the particular reasons, but, rather, it is sufficient if defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff. *Burdine*, 450 U.S. at 254-55, 101 S. Ct. at 1094. The defendant can raise this issue of fact by clearly and specifically articulating a legitimate reason for rejecting the plaintiff. *Crockett v. City of Billings*, 234 Mont. 87, 94, 761 P.2d 813, 817 (1988).

¶34 The hearing examiner determined that Montana Tech met this burden of production by providing the following six reasons for not renewing Ray as department head:

> 1) Ray's unprofessional attitude and behavior when discussing a new course; 2) Ray's unwillingness to attend routine administration meetings unless he could bring a lawyer or tape record the meetings; 3) Ray's unwillingness to investigate allegations of a professor, for whom Ray was responsible, who was alleged to have attended class intoxicated; 4) Ray's unwillingness to schedule evening classes; 5) Ray's unwillingness to cooperate with his supervisors about relocating department members and Ray's threat to oppose this relocation by inciting students and non-campus members to become involved; and 6) Ray's inability to resolve inter-departmental disputes.

¶35 It then became Ray's obligation under the *McDonnell Douglas* test to prove by a preponderance of the evidence that the reasons for adverse action offered by Montana Tech were not true, but, rather, were a pretext for discrimination. After considering the evidence presented, the hearing examiner found, as a matter of fact, the reasons given by Montana Tech for not renewing Ray's contract as department head were legitimate, nondiscriminatory, and were not a pretext for discrimination. Both the full Human Rights Commission and the District Court upheld the hearing examiner. The District Court held that these findings were supported by substantial evidence and were not caused by misapprehension of the effect of that evidence.

¶36 On appeal, Ray claims the reasons advanced by Montana Tech for the adverse action were not the true reasons for his non-renewal. He urges this Court to disregard the factual findings of the hearing examiner and conclude that the reasons given by Montana Tech were a pretext for discrimination.

12

¶37 Our review of the record confirms that the reasons given for Ray's non-renewal as head of the liberal studies department are supported by substantial evidence. Ray's behavior toward the administration regarding the new course, his unwillingness to cooperate in department realignment, his threat to incite students to oppose such realignment, and his inability to resolve inter-departmental disputes are relevant to his performance as the head of an academic department at Montana Tech. None of these reasons had anything to do with Ray's political beliefs. Montana Tech did not have to carry the burden of persuading the Commission that these were the reasons Ray was not renewed. All that was necessary was that they were supported by the record and were legitimate and nondiscriminatory reasons for not renewing Ray. *Crockett*, 234 Mont. at 94, 761 P.2d at 817. Furthermore, the standard is not whether there is evidence to support findings different from those made by the trier of fact, but whether substantial credible evidence supports the findings. *Benjamin v. Anderson*, 2005 MT 123, ¶ 55, 327 Mont. 173, ¶ 55, 112 P.3d 1039, ¶ 55.

¶38 The hearing examiner also found as a matter of fact that Ray's environmental views and activism were not discussed at the July 1999 meeting where it was determined that his contract as a department head would not be renewed. The hearing examiner specifically found that Ray's environmental views were not a cause of his non-renewal. This finding is also based on substantial evidence in the record.

¶39 The District Court did not err in affirming the Commission's decision to dismiss Ray's complaint that he was discriminated against because of his political views.

*B. District Court lawsuit alleging violation of the right to free speech.*

¶40   Ray alleged in his amended complaint that the named individual defendants, acting under color of state law, violated his right to freedom of speech as guaranteed by the First Amendment to the United States Constitution and Article II, Section 7, of the Montana Constitution.  He therefore claims damages pursuant to 42 U.S.C. § 1983.

¶41   Ray does not argue that his actions outlined in five of the six reasons Montana Tech gave for his non-renewal as department head, noted in ¶ 31 above, are entitled to protection as free speech.  His claim on appeal is that his contract as department head was not renewed in retaliation for sending the e-mail of June 30, 1999.  In this e-mail he compared proposals to relocate department members to harassment and threatened to mobilize students and others to oppose the relocation proposal at every step.  Montana Tech cited this e-mail as one of its six reasons for not renewing Ray's contract as department head.  Thus, Montana Tech has admitted that the adverse action taken against Ray was at least partially motivated by what Ray claims is a violation of his free speech rights.  We therefore examine whether Ray's right to free speech was violated when Montana Tech did not renew his contract based, in part, on this internal e-mail.

¶42   The "threshold question" in assessing a free speech claim by a public employee is whether the employee is speaking out as an employee on a matter of personal interest, or as a citizen on a matter of public interest.  *Gardetto v. Mason*, 100 F.3d 803, 812 (10th Cir. 1996) (citing *Connick v. Meyers*, 461 U.S. 138, 147, 103 S. Ct. 1684, 1690 (1983)); *see also Taliaferro*, 235 Mont. at 29, 764 P.2d at 864.   Matters of public concern are those which relate to matters of social or political concern in the community.  *Connick*,

14

461 U.S. at 146, 103 S. Ct. at 1690.

¶43 The First Amendment, however, does not require public universities to subject internal structural arrangements and administrative procedures to public scrutiny or debate. *Bunger v. Univ. of Okla. Bd. of Regents*, 95 F.3d 987, 992 (10th Cir. 1996). Indeed, to do so would mean nearly every remark could give rise to a constitutional claim. *Kurtz v. Vickrey*, 855 F.2d 723, 727 (11th Cir. 1988) (citing *Connick*, 461 U.S. at 149, 103 S. Ct. at 1691). We conclude that Ray's June 30, 1999, e-mail, under the circumstances presented by this case, is not protected speech. Its contents do not amount to matters of public concern. All of the reasons given by Montana Tech for not renewing Ray's contract as a department head, and specifically the June 30, 1999, e-mail, concern "internal structural arrangements and administrative procedures" at Montana Tech. *Bunger*, 95 F.3d at 992. Because such issues do not "transcend the internal workings of the university to affect the political or social life of the community" they are not matters of public concern and, thus, not entitled to constitutional protection. *Bunger*, 95 F.3d at 992.

¶44 The District Court did not err in granting summary judgment to the individual defendants and in dismissing Ray's civil rights claim brought pursuant to 42 U.S.C. § 1983.

ISSUE TWO

¶45 **Did Montana Tech discriminate against Ray on the basis of his marital status?**

¶46 Ray argues that he suffered employment discrimination based on his marital status

15

in violation of § 49-2-303(1)(a), MCA, which makes it unlawful for Montana Tech to discriminate against a person in employment because of marital status, and also in violation of § 49-3-201(1), MCA, which requires Montana Tech to appoint, assign and promote personnel on the basis of merit without regard to marital status. According to Ray, Abbott opposed his renewal as department head, in part, because Ray was married to a member of the Liberal Studies Department. He further contends that Abbott's position on this matter influenced both Bradley and Gilmore.

¶47 The hearing examiner again applied the *McDonnell Douglas* burden-shifting test and determined that Ray had proved a prima facie case of marital status discrimination, thus shifting the burden to Montana Tech. As with Ray's claim that he was discriminated against because of his political beliefs, Ray has presented circumstantial evidence that his contract as a department head was not renewed based on his marital status. Thus, the Commission and the District Court correctly applied the *McDonnell Douglas* test to Ray's marital status discrimination claim.

¶48 Again, in order to shift the burden of proof back to Ray, Montana Tech bore only the burden of producing legitimate, nondiscriminatory reasons for Ray's non-renewal – not of persuading the court that these were the actual reasons Ray was not renewed. *Johnson*, 226 Mont. at 140, 734 P.2d at 212. The hearing examiner again determined that Montana Tech met this burden because the six reasons the school provided in response to Ray's political beliefs discrimination claim applied with equal force to his marital status discrimination claim. Montana Tech, by advancing the six reasons noted in ¶ 34 as non-

16

discriminatory reasons for not renewing Ray's contract as department head, shifted the burden back to Ray to prove that they were pretextural.

¶49 The hearing examiner found that the testimony of Abbott that Ray's marital status was discussed at the meeting on July 6, 1999, raised a question of pretext, but did not establish it. The hearing examiner ultimately found as a matter of fact that the reasons for not renewing Ray's contract as department head were not pretextual. The Human Rights Commission and the District Court affirmed the hearing examiner's findings of fact. The District Court specifically noted that other persons at the meeting testified that Ray's marital status was not discussed, and that the hearing examiner found their testimony more credible than Abbott's.

¶50 The Commission and the District Court correctly deferred to the hearing examiner's determination of witness credibility. It is within the province of the trier of fact to weigh conflicting evidence, and a reviewing court will not substitute its judgment for that of the trier of fact on such matters. *Holtz v. Deisz*, 2003 MT 132, ¶ 15, 316 Mont. 77, ¶ 15, 68 P.3d 828, ¶ 15. As noted above in ¶ 37, the standard is not whether there is evidence to support a different finding from that made by the trier of fact. Rather, we review the record to determine whether the District Court's findings were supported by substantial evidence. *Benjamin*, ¶ 55. All of the hearing examiner's findings on Ray's marital status discrimination claim were adequately supported by the record. None of the six reasons provided by Montana Tech for not renewing Ray's contract as a department head were related to his marital status. Rather, the school took into consideration Ray's past job performance – a perfectly legitimate consideration in applying the *McDonnell*

*Douglas* test. *Crockett*, 234 Mont. at 94, 761 P.2d at 817-18 (citing *McDonnell Douglas*, 411 U.S. at 806-07, n. 21, 93 S. Ct. at 1826, n. 21.

¶51    The record contains substantial evidence that supports the hearing examiner's findings that Montana Tech had multiple legitimate, nondiscriminatory reasons for not renewing Ray's contract as a department head, and that these reasons were not a pretext for marital status discrimination. The District Court did not err in affirming the Montana Human Rights Commission's determination that Montana Tech did not discriminate against Ray on the basis of marital status.

ISSUE THREE

¶52    **Did Montana Tech violate Ray's right to due process?**

¶53    Ray argues that he had a property interest in his position as department head and Montana Tech failed to provide him due process when he was not renewed. This property interest arose, according to Ray, because Montana Tech had a *de facto* system of renewing the contracts of department heads and thus his situation is similar to that found to exist by the United States Supreme Court in *Perry v. Sindermann*, 408 U.S. 593, 92 S. Ct. 2694 (1972). In *Perry*, the court held that while a subjective expectancy of tenure in a particular position is not protected by procedural due process, a *de facto* or common law tenure policy, arising from rules and understandings officially promulgated and fostered by government officials, might justify a legitimate claim to continued employment sufficient to warrant due process protection. *Perry*, 408 U.S. at 602-03, 92 S. Ct. at 2700. The U.S. Supreme Court concluded that if there are rules or mutually explicit understandings that support a claim of tenure a hearing may be required. *Perry*, 408 U.S.

18

at 601, 92 S. Ct. at 2699. According to Ray, when Montana Tech failed to give him three-months notice prior to his non-renewal as department head as required by its own policies, his *de facto* property interest vested and, therefore, the university violated his right to due process by not renewing his contract. However, in *Perry* there was no contractual or formal written policy which described Perry's tenure in his position. *Perry*, 408 U.S. at 599, 92 S. Ct. at 2698. In this case, unlike in *Perry*, there was a written tenure system in place. Montana Tech had formal tenure regulations which were designed to avoid the *de facto* tenure problem recognized in *Perry*. The existence of a formal code governing the granting of tenure precludes a reasonable expectation of continued employment absent extraordinary circumstances. *Haimowitz v. Univ. of Nev.*, 579 F.2d 526, 528 (9th Cir. 1978). *Perry* does not apply to the facts in Ray's case.

¶54 In order to have a property interest in an employment position, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. *Akhtar v. Van De Wetering*, 197 Mont. 205, 211, 642 P.2d 149, 153 (1982) (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 577, 92 S. Ct. 2701, 2709 (1972)). The source of an entitlement establishing a property interest may be found in state law or in rules or understandings existing between the individual and his employer. *Akhtar*, 197 Mont. at 211, 642 P.2d at 153 (citing *Roth*, 408 U.S. at 577, 92 S. Ct. at 2709). In the present case, Montana Tech had a formal, written tenure policy in place at the time it decided not to renew Ray as department head. This policy clearly stated that department heads served at the discretion of the president and may be removed at any time. The policy also provided

19

that faculty serving as department heads "do not have tenured status with respect to those positions. . . ." In light of Montana Tech's express policy, Ray could not have had a reasonable expectation of his renewal as department head. Nor was such an expectation established by state law as allowed by our holding in *Akhtar*. 197 Mont. at 211, 642 P.2d at 153. Indeed, Montana Tech made deliberate efforts to advise its employees, including Ray, that they did not have tenured status in department head positions. Because a successful due process claim requires a protected property interest, and Montana Tech's explicit, published, policies expressly precluded any type of *de facto* tenure, Ray's due process claim must fail.

¶55 Ray also contends that the *Policy and Procedures Manual of the Mont. Bd. of Regents of Higher Educ.*, Policy 706.1(5), along with Policy 711.1, created an expectation that his contract as head of the Liberal Studies Department would be renewed.

¶56 Policy 706.1(5) provides in relevant part:

> In cases of the non-renewal of an administrator's employment contract, the notice provisions of Board Policy 711.1 shall apply.

¶57 The notice provisions of Policy 711.1 are:

> Except in situations involving termination for cause or loss of funding . . . professional and administrative employees hired through a Montana University System professional employment contract shall be given written notice of intent not to renew their contracts at least 30 days prior to expiration during the first year of employment, three (3) months prior to expiration during the second year of employment, or six (6) months prior to expiration during the third or subsequent years of employment with the institution in a full-time position.

20

¶58 Thus, according to Ray, because he was an administrative employee for two years, Policy 711.1 required Montana Tech to give him three-months notice that his contract would not be renewed. Since he did not receive such notice, he claims a property interest in the position of department head.

¶59 Ray's amended complaint alleges that he was the "program manager of Liberal Studies" from August of 1997 through July of 1998. However, the amended complaint makes no allegation that a program manager was an administrative employee as contemplated by Policy 706.1(5). Ray did not file an affidavit in opposition to the Defendants' motion for summary judgment to the effect that a program manager was an administrative employee. There are no contracts or other exhibits in the record indicating that during the time he was a program manager Ray was an administrative employee. In his briefs on appeal Ray does not refer this Court to anything in the record that raises an issue of material fact whether a program manager is an administrative employee. M. R. App. P 23(a)(4) requires that a party's argument shall refer to the pages of the record relied on. Furthermore, it is not this Court's obligation to guess what a party's precise position is or conduct legal research that may lend support to his position. *Pankratz Farms Inc. v. Pankratz*, 2004 MT 180, ¶ 82, 322 Mont. 133, ¶ 82, 95 P.3d 671, ¶ 82; *In re Estate of Bayers*, 1999 MT 154, ¶ 19, 295 Mont. 89, ¶ 19, 983 P.2d 339, ¶ 19. Ray has not established that he was an administrative employee for two years. Ray has acknowledged in his reply brief that the record is inadequate to determine that he did not receive 30-days notice of the non-renewal of his contract as department head. Ray's

argument that he had an expectation of continued employment as a department head based on Montana Tech's policies is not well taken.

¶60 The District Court did not err in granting summary judgment to Defendants and dismissing Ray's 42 U.S.C. § 1983 claim based on denial of due process.

CONCLUSION

¶61 The orders of the First Judicial District Court, Lewis and Clark County, dismissing Ray's amended complaint are affirmed.

/S/ JOHN WARNER

We Concur:

/S/ PATRICIA COTTER
/S/ W. WILLIAM LEAPHART
/S/ JAMES C. NELSON
/S/ JIM RICE