DA 10-0337

IN THE SUPREME COURT OF THE STATE OF MONTANA

2011 MT 144

THE CITY OF GREAT FALLS, BENEFIS HEALTH
CARE, INC., and ELECTRIC CITY POWER, INC.,

        Petitioners and Appellees,

   v.

MONTANA DEPARTMENT OF PUBLIC SERVICE
REGULATION, PUBLIC SERVICE COMMISSION,
and NORTHWESTERN ENERGY,

        Respondents and Appellants.

APPEAL FROM:    District Court of the First Judicial District,
                 In and For the County of Lewis and Clark, Cause No. CDV 09-127
                 Honorable Kathy Seeley, Presiding Judge

COUNSEL OF RECORD:

      For Appellants:

           Jim Paine, Special Assistant Attorney General, Helena, Montana (Public
           Service Regulation and Public Service Commission)

           Scott M. Stearns and Thomas J. Leonard, Boone Karlberg, P.C., Missoula,
           Montana (NorthWestern Energy)

           Jason Williams, Attorney at Law, Butte, Montana (NorthWestern Energy)

      For Appellee:

           John Alke, Hughes, Kellner, Sullivan & Alke, PLLP, Helena, Montana
           (Benefis Health Care, Inc.)

      For Amicus:

Lisa A. Speare and John Walker Ross, Brown Law Firm, P.C., Billings, Montana

_____

Submitted on Briefs:  April 6, 2011

Decided:  June 21, 2011

Filed:

_____
Clerk

Justice Michael E Wheat delivered the Opinion of the Court.

¶1 The Montana Public Service Commission (PSC) and NorthWestern Energy (NWE) appeal from an order of the First Judicial District Court, Lewis and Clark County, reversing the PSC's Final Order No. 6964 (Final Order).

¶2 The sole issue on appeal is whether the District Court erred in interpreting § 69-8-201(2), MCA (2007), as granting Benefis Health Care, Inc. (Benefis), the right, after October 1, 2007, to use a supplier of electricity, other than NWE, for all of its delivery points.

## BACKGROUND

¶3 The 1997 Montana Legislature enacted the Electric Utility Industry Restructuring and Customer Choice Act, Title 69, chapter 8, MCA (1997) ("Deregulation Act"), with the intent of affording Montana consumers the ability to choose their electricity supplier in a competitive market. The Deregulation Act forced the public utility, Montana Power Company, to separate its generation assets from its distribution assets. NWE acquired the distribution assets. Under the Deregulation Act, NWE, the default supplier, was required to provide electricity to all customers who could not obtain it on the open market.

¶4 In 2007, the legislature enacted the Electric Utility Industry Generation Reintegration Act, Title 69, chapter 8, MCA (2007) ("Reintegration Act"), which returned NWE to a vertically-integrated utility that owned its own generation facilities and sold electricity to consumers at the PSC-regulated rates. While a captive customer base was essential to the success of the Reintegration Act, it did not completely eliminate customer choice and expressly preserved supply choices made by electricity consumers who, relying on the

3

Deregulation Act, obtained their electricity from a competitive supplier. The scope of the surviving customer choice carved out by the Reintegration Act is the subject of this appeal.

¶5 As a result of the Deregulation Act, the City of Great Falls (City) established Electric City Power, Inc. (ECP) to purchase wholesale electric energy. The PSC licensed ECP as an electricity supplier. ECP then entered into supply contracts with retail customers, including the City, Benefis, and Southern Food Group, LLC, d/b/a Meadow Gold Dairies (MGD).[1] NWE was the default electricity supplier in the area served by ECP through September 2007.

¶6 In accordance with the Reintegration Act, NWE became the public utility obligated to provide electricity to that area on October 1, 2008. Between September and December 2007, ECP notified NWE that certain points of delivery owned by the City, Benefis, and MGD should be included among the meters and/or points of delivery served by ECP. NWE, relying upon notice provisions contained in the PSC Tariff Sheet No. 64.1, Schedule ECCGP-1 (Tariff), refused to allow ECP to provide the requested electricity supply service.[2] On October 1, 2007, the City, Benefis, and MGD were receiving electricity supply service from ECP at all of their meters, except those that NWE refused to transfer.

¶7 Following NWE's denial of their request, the City, Benefis, and ECP filed a complaint with the PSC, challenging the lawfulness of NWE's refusal to allow ECP to provide electricity supply to the meters in dispute. On December 9, 2008, the PSC issued its

---

[1] MGD did not participate in the PSC or District Court proceedings.
[2] The Tariff, effective July 1, 2003, establishes guidelines and procedures for customers choosing between the default electricity supplier (NWE) and competitive electricity suppliers, including requirements that public agency customers, such as the City, notify NWE at least thirty business days prior to any market supply deliveries. Midsized customers, such as Benefis, are required to give notice at least ten business days prior to choosing a competitive supplier.

4

Final Order, which concluded ECP could not provide electricity supply service to the disputed meters. Critical to this appeal, the PSC based its decision upon its interpretation that "customer," as contained in §§ 69-8-201(2)(a) and (b), MCA (2007), meant an individual meter or point of delivery, rather than an entity or person.

¶8     The City, Benefis, and ECP appealed the Final Order. The District Court reversed, finding error in the PSC's statutory interpretation, and remanded the matter to the PSC to allow all of the City's and Benefis' meters to receive electricity supply service from ECP. NWE and the PSC appeal. The City and ECP take no position on appeal.

## STANDARD OF REVIEW

¶9     Initially, we must resolve what standard of review to apply. The PSC urges us to adopt a deferential standard of review where we determine "whether the agency's conclusion is incorrect with deference to the agency's conclusions of law that are reasonable when the statute is ambiguous or subject to multiple interpretations." The PSC asserts that our current standard of review (whether the agency's/district court's conclusions of law are correct, *Ray v. Mont. Tech of the U. of Mont.*, 2007 MT 21, ¶ 24, 335 Mont. 367, 152 P.3d 122) is based upon a false assumption that only one correct interpretation of a statute exists and ignores an administrative agency's special expertise.

¶10    This Court has previously addressed how the concept of deference to administrative agency decisions applies in statutory construction, concluding that where the meaning of a particular statute is in doubt, and an administrative agency has ascribed a particular meaning to that statute "through a long and continued course of consistent interpretation, resulting in

5

an identifiable reliance," such administrative agency considerations are not binding upon courts, but are entitled to a " 'respectful consideration.' " *Mont. Power Co. v. Mont. Pub. Serv. Commn.*, 2001 MT 102, ¶¶ 24-25, 305 Mont. 260, 26 P.3d 91 (quoting *Doe v. Colburg*, 171 Mont. 97, 100, 555 P.2d 753, 754 (1976)). Accordingly, we decline to expand the amount of deference with which we review an agency's findings and conclusions of law.

¶11 This Court applies the same standards as the district court when reviewing its determination regarding an agency decision. *Ray*, ¶ 24. Under the Montana Administrative Procedure Act, a court reviewing an agency decision "may reverse or modify the decision if substantial rights of the appellant have been prejudiced because: (a) the administrative . . . conclusions . . . are: (i) in violation of constitutional or statutory provisions." Section 2-4-704(2), MCA. Accordingly, we review the agency's interpretations, as well as the district court's conclusions of law, for correctness. *Mont. Power Co.*, ¶ 21.

## DISCUSSION

¶12 *Whether the District Court erred in interpreting § 69-8-201(2), MCA (2007), as granting Benefis the right, after October 1, 2007, to use a supplier of electricity, other than NWE, for all of its delivery points.*

¶13 Section 69-8-201(2), MCA (2007), the statute in dispute, provides as follows:

> (a) A retail customer that has an individual load with an average monthly demand of less than 5,000 kilowatts that is not purchasing electricity from a public utility on October 1, 2007, may continue to purchase electricity from an electricity supplier. The retail customer may subsequently purchase electricity from a public utility subject to commission rule or order, but the customer may not, at a later date, choose to purchase electricity from another source.
> (b) A retail customer that has an individual load with an average monthly demand of less than 5,000 kilowatts and that is currently purchasing electricity

6

from a public utility may not choose to purchase electricity from another source after October 1, 2007.

¶14 In interpreting § 69-8-201(2), MCA (2007), the PSC considered the Tariff notice provisions, which state in relevant part:

(2) All retail customers can choose their supplier of electricity according to the terms and procedures provided in this Schedule and, if applicable, a written contract with the utility. All choice customers may also return to Default Supply service in accordance with the terms of this Schedule.

. . .

(5)(d) Mid-Sized Customers electing to choose a competitive supplier must notify the Utility in writing (including e-mail and fax) at least 10 business days in advance. A Mid-Sized Customer may provide written notice through a selected supplier.

. . .

(7)(c) Public agency customers electing market supplies must notify the Utility in writing (including e-mail and fax) at least 30 business days in advance of any market supply deliveries. A public agency customer may provide written notice through a selected supplier.

¶15 The PSC determined that because the City and Benefis did not comply with the Tariff notice provisions and notify NWE within specified periods of time prior to October 1, 2007, the meters in dispute automatically defaulted to NWE. Based upon its application of the Tariff, the PSC concluded that, under § 69-8-201(2), MCA (2007), the City and Benefis were purchasing electricity from both a public utility (NWE) and an electricity supplier (ECP) on October 1, 2007. The PSC determined that §§ 69-8-201(2)(a) and (b), MCA (2007), create and require distinct and mutually exclusive classes and that the term "customer" must refer to an individual meter and/or point of delivery in order to maintain the distinct classes.

¶16 The District Court reversed, concluding that the plain language of § 69-8-201(2), MCA (2007), trumped the Tariff and required "customer" to be defined as an entity or

7

person, rather than an individual meter or point of delivery, because such interpretation was consistent with the plain meaning of the term "customer" and the legislature's intent to protect the rights of customers who chose to continue to receive electricity from private suppliers, such as ECP, after the Reintegration Act was enacted.

¶17 On appeal, NWE and the PSC argue the Tariff has the force of law; the legislature is presumed to be acquainted with existing law; and, therefore, because the City and Benefis did not comply with the Tariff's notice provisions, NWE could not legally grant their untimely request to change electricity suppliers. NWE and the PSC further argue the PSC's interpretation of § 69-8-201(2), MCA (2007), avoids the absurd result that a customer could fit into both §§ 69-8-201(2)(a) and (b), MCA (2007), and is consistent with the legislative intent behind the Reintegration Act that NWE become a vertically-integrated utility, with customer choice being eliminated in order to achieve that end.

¶18 In interpreting a statute, a court's duty " 'is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted or to omit what has been inserted.' " *Spoklie v. Mont. Dept. of Fish, Wildlife & Parks*, 2002 MT 228, ¶ 24, 311 Mont. 427, 56 P.3d 349 (quoting § 1-2-101, MCA). A court must attempt to implement the intent of the legislature when interpreting a statute by looking to the plain meaning of the words used. *MM&I, LLC v. Bd. of Co. Commrs. of Gallatin Co.*, 2010 MT 274, ¶ 44, 358 Mont. 420, 246 P.3d 1029. Absent statutory definitions, the plain meaning of the words used controls. *Spoklie*, ¶ 25. In discerning the plain meaning, the words used shall be reasonably and logically interpreted, so as to give them their usual and ordinary meaning. *MM&I*, ¶ 44.

8

¶19 The Reintegration Act does not specifically define the term "customer." However, it uses the term "customer" with other terms in several definitions, all of which contemplate entities or persons, rather than individual meters, including "customer-generator," which means "a user of a net metering system," § 69-8-103(6), MCA (2007); "large customer," which means, "for universal system benefits programs purposes, a customer with an individual load greater than a monthly average of 1,000 kilowatt demand in the previous calendar year for the individual load," § 69-8-103(15), MCA (2007); "low-income customer," which means "those energy consumer households and families with incomes at or below industry-recognized levels that qualify those consumers for low-income energy-related assistance," § 69-8-103(17), MCA (2007); and, "retail customer," which means "a customer that purchases electricity for residential, commercial, or industrial end-use purposes and does not resell electricity to others," § 69-8-103(23), MCA (2007).

¶20 In addition, the Tariff upon which the PSC's and NWE's arguments rely contains definitions incorporating the term "customer," all of which refer to an entity or person, rather than an individual meter. For example, the Tariff defines an "individual customer" as "a person or entity separately identified in the Utility's billing system as the person or entity to which bills will be sent for service to one or more metered or unmetered accounts"; a "large customer" as "an existing retail customer with an actual average monthly Billing Demand for the previous calendar year, or a new customer's estimated annual average monthly demand equal to or greater than 5,000 kilowatts"; a "mid-sized customer" as "[a]n existing retail customer with an actual average monthly Billing Demand for the previous calendar year, or a

9

new customer's estimated annual average monthly demand, of at least 50 kilowatts and less than 5,000 kilowatts"; and, a "small customer" as "[a] retail customer with an actual average monthly Billing Demand for the previous calendar year, or a new customer's estimated annual average demand, less than 50 kilowatts."

¶21 Further, the term "customer" ordinarily and usually means "a person who purchases goods or services from another; buyer; patron" or "a person one has dealings with." *Random House Webster's College Dictionary* 328 (2d ed., Random House 1999). By contrast, the term "meter" ordinarily and usually means "an instrument for measuring and recording the quantity of something . . . ." *Id.* at 832. The treatment of the term "customer" by the Reintegration Act and Tariff and its plain meaning all indicate that it means an entity or person, such as Benefis, rather than an individual meter.

¶22 Finally, we are not persuaded by the PSC's argument that under § 69-8-201(2), MCA (2007), "customer" must mean an individual meter, rather than an entity or person, in order to maintain mutually exclusive classes. This argument is erroneously based upon the Tariff notice provisions, which have no application here. Where administrative rules are in conflict with or inconsistent with a statute, the statute prevails. Section 2-4-305(6)(a), MCA. The Tariff went into effect in July 2003 (before the Reintegration Act was enacted) and imposes notice requirements on consumers choosing between a competitive electricity supplier and default supplier. The Tariff notice requirements regarding choosing electricity supply service are inconsistent with the clear deadline established by § 69-8-201(2), MCA (2007), that a customer not purchasing electricity from a public utility on October 1, 2007, be

allowed to continue to purchase electricity from a competitive supplier. The Tariff is inapplicable.

¶23 We cannot insert into § 69-8-201(2), MCA (2007), what has been omitted. *Spoklie,* ¶ 24. Had the 2007 Montana Legislature intended that individual meters receiving electricity from an electricity supplier on October 1, 2007, be permitted to continue to do so, but individual meters receiving electricity from NWE on October 1, 2007, be required to continue purchasing electricity from NWE, it should have stated so. Instead, the Legislature plainly stated that customers who were receiving all of their electricity from a supplier, such as ECP, on October 1, 2007, could continue doing so. Interpreting "customer" as an entity or person, rather than an individual meter, comports with the plain language of the term, its usage within the Reintegration Act and Tariff, and the legislative intent that those persons or entities who had elected to receive their electricity from a competitive supplier, pursuant to the Deregulation Act, be allowed to continue to do so.

**CONCLUSION**

¶24 The District Court correctly determined that under § 69-8-201(2), MCA (2007), the term "customer" means an entity or person, rather than an individual meter and, accordingly, correctly permitted the City and Benefis to receive electricity from ECP at the disputed meters.

¶25 Affirmed.

/S/ MICHAEL E WHEAT

11

We Concur:

/S/ JAMES C. NELSON
/S/ PATRICIA COTTER
/S/ JIM RICE